David R. Ehrlich (de-9786)
Scott W. Clark (sc-9218)
Stagg Wabnik Law Group LLP
401 Franklin Avenue, Suite 300
Garden City, New York 11530
(516) 812-4550
dehrlich@staggwabnik.com
sclark@staggwabnik.com

*Attorneys for Plaintiff*
*Darrell Wallace*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DARRELL WALLACE,

|  |  |
|---|---|
| Plaintiff, | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |

THE CITY OF NEW YORK, LOUIS MOLINA,
Individually and as Commissioner of the New York City
Department Of Correction, and MANUEL
HERNANDEZ, Individually and as Deputy
Commissioner of the Investigation Division of the New
York City Department of Correction,

Defendants.
-------------------------------------------------------------------X

Plaintiff Darrell Wallace ("Plaintiff" or "Wallace") by and through his attorneys, Stagg

Wabnik Law Group LLP, as and for his complaint against defendants the City Of New York (the

"City"), Louis Molina, individually and as Commissioner of the New York City Department of

Correction, and Manuel Hernandez, individually and as Deputy Commissioner of the New York

City Department of Correction (collectively referred to as "Defendants"), state and allege as

follows:

## NATURE OF THE ACTION

1.      Plaintiff was a dedicated employee of the City of New York through the New

York City Department of Correction ("DOC") for over seven years until he was suspended,

unjustly placed on modified duty, and constructively discharged after Defendants engaged in a reckless and unwarranted search and seizure of Plaintiff, and improperly held, arrested and charged him with a crime, a crime which was later dismissed in its entirety due to the absurdity of the charge. Specifically, members of the DOC's Investigation Division ("ID"), whose authority to investigate contraband introduction is trumped by the New York City Department of Investigations ("DOI"), wrongly searched, seized, arrested and charged Plaintiff with possessing liquid cocaine based on finding a blue children's balloon under the floor mat in his car. The balloon allegedly contained a small amount of liquid. The balloon that was found was not one that would ever be used for carrying contraband—it was a blue children's balloon. Based on that flimsy and absurd evidence, Defendants held Plaintiff for over 55 hours before he was arraigned on an obviously bogus drug charge. Defendants also suspended Plaintiff with respect to his employment because of the charge. The charge, however, was dismissed in its entirety a mere month later because of how ridiculous it was, and after a drug lab concluded the obvious: there were no drugs in that balloon. Nevertheless, even after the DOC was in possession of conclusive proof of Plaintiff's innocence, the DOC continued to punish Plaintiff for the incident by placing him on modified duty, and denying Plaintiff's request for a reasonable accommodation by refusing to allow him to return to his former position--a position that accommodated his disability--thus resulting in his constructive discharge. To make matters worse, Defendants refused to acknowledge Plaintiff's innocence and full exoneration of the drug charge so as to avoid further embarrassment and used Plaintiff's arrest and Plaintiff as the poster boy for Defendants' policy of searching correction officers for contraband and drug smuggling. Indeed, Defendants made public statements touting Plaintiff's arrest, and the fact that Plaintiff was later fully exonerated and that the evidence against him was objectively absurd would have embarrassed Defendants. Defendants' self-congratulatory statements about the incident led a

New York City Councilmember to publicly commend Defendants for arresting Plaintiff, a stance that was highlighted in the New York Daily News, which also named Plaintiff in an article praising Defendants "meaningful action" to stem drugs and contraband from entering Rikers Island. Accordingly, Defendants violated Plaintiff substantive and procedural due process rights, his rights under the New York State and City Human Rights Laws, and falsely imprisoned him.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiff claims violation of the Fourth Amendment to the United States Constitution.

3.      This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 USC § 1367.

4.      Venue is proper in this District pursuant to Title 28 U.S.C. § 1391(b) and (c) as Plaintiff's claims arose within this District.

## PARTIES

5.      Plaintiff is an individual residing in Kings County in the State of New York and was employed by Defendants as a Correction Officer.

6.      Plaintiff suffers from a severe medical illness--kidney disease--that requires him to receive dialysis three times a week, making Plaintiff disabled under New York State and City Human Rights Laws.

7.      Defendant City of New York was and still is a municipal corporation and operates the New York City Department of Correction.

8.      At all relevant times herein, the City had the power to, *inter alia*, hire and fire employees, set their work schedules, determine job duties and responsibilities, maintain employment records, conduct evaluations, and had the authority to alter the terms and conditions of employees' employment, including Plaintiff.

9.      At all relevant times herein, Defendant Louis Molina was the Commissioner of the New York City Department of Correction and a resident of New York State.

10.     Defendant Molina had the power to hire and fire employees and was in charge of operational decisions and policies of the DOC, including the DOC's Investigation Division, which is a separate entity from the DOI, and ordered the search DOC employees for contraband, as explained below.

11.     At all relevant times herein, Defendant Manuel Hernandez was the Deputy Commissioner of the Investigation Division of the New York City Department of Correction and a resident of New York State.

12.     Defendant Hernandez had the power to hire and fire employees, and was in charge of the ID, and the operational decisions and policies of the ID, and ordered the searches of DOC employees for contraband, as explained below.

## STATEMENT OF FACTS

13.     On or about January 18, 2023, Claimant was driving to work on Rikers Island at approximately 6:00 a.m. to begin his 7:00 a.m. shift.

14.     As he was on the bridge to Rikers Island, Plaintiff witnessed DOC employees pulling over vehicles on Rikers Island.

15.     The DOC employees were not part of the DOI, the law enforcement agency of the government of New York City.  Rather, upon information and belief, Defendants Molina and Hernandez created their own security squad within the DOC's ID to perform random searches on DOC employees as they arrived at work.  Defendant Molina, who was widely criticized by oversight bodies and the City Council for the number of drugs in his jails, was attempting to

demonstrate that he was cracking down on the smuggling of contraband into Rikers by correction officers.

16.     Two of the DOC investigators who were part of Defendant Molina's security squad approached Plaintiff's car and instructed him to turn off his engine and lower his windows.

17.     After Plaintiff complied, one of the correction officers with a K-9 dog walked around Plaintiff's vehicle.

18.     Plaintiff did not witness the dog react in any way as it walked around his vehicle.

19.     After the dog walked around Plaintiff's car, officers instructed Plaintiff to exit his vehicle.

20.      Plaintiff exited his vehicle, and the officers took the Plaintiff's shield and identification.

21.     After Plaintiff exited his vehicle, officers placed the dog into Plaintiff's car.

22.     While in Plaintiff's car, the dog walked back and forth between Plaintiff's front and back seats but did not react or sit.

23.     After the dog finished walking back and forth between Plaintiff's seats, DOC investigators informed Plaintiff that his vehicle was going to be searched in a separate area. DOC investigators entered Plaintiff's car and drove it away, out of Plaintiff's sight.

24.      The DOC investigators claimed that after searching Plaintiff's vehicle at that second location, they found a blue children's balloon under a floor mat in Plaintiff's car that purportedly contained a small amount of liquid.

25.     The DOC investigators purportedly conducted a field test of the small amount of liquid found in the balloon, even though the balloon was of the type not generally used for smuggling contraband, as it was an untied blue children's balloon.  Defendants purportedly claimed that it tested positive for liquid cocaine.

26.     Upon information and belief, drug field tests, like the one used by Defendants, are well-known to be inaccurate in that they often result in false positives.

27.     At or around 6:20 am on January 18, 2023, Defendants took Plaintiff into custody.

28.     The officers who conducted the search and took Plaintiff into custody were DOC investigators chosen by Commissioner Molina and Deputy Commissioner Hernandez, and not personnel from the DOI and were not supervised by the DOI.

29.     Upon information and belief, the DOI must be involved in any administrative search and/or seizure of any New York City employee.  Upon information and belief, when DOI was informed of the alleged evidence collected in this incident, it determined that Plaintiff should not have been arrested.

30.     After the DOC personnel took Plaintiff into custody, they brought him to another office on the island, where a correction officer stayed in the room with Plaintiff.

31.     After hours in custody, Plaintiff informed the officer that he had a scheduled dialysis appointment that day.  Plaintiff was informed he could not attend said appointment despite requesting to go several times.

32.     Later, three plainclothes DOC investigators took Plaintiff to the 41st precinct in the backseat of a DOC vehicle.  Officers informed Plaintiff they allegedly found contraband in his car.

33.     Plaintiff asked the DOC investigators what type of contraband was found in his car, but they refused to answer.

34.     When Plaintiff arrived at the 41st precinct, he was fingerprinted, read his Miranda rights, and placed in a holding cell.

35.     After an indeterminate amount of time, Plaintiff was moved from the holding cell to a holding room, where Plaintiff was handcuffed to a bench.

6

36.     Plaintiff was left handcuffed to a bench in the holding room all night.

37.     On the morning of January 19, 2023, Defendant transported Plaintiff to central booking in a police vehicle while Plaintiff's hands were handcuffed behind his back.

38.     When Plaintiff arrived at central booking on the morning of the 19th, he informed officers that he required dialysis.

39.     After thirty minutes, Defendant transported Plaintiff in handcuffs and shackles to Lincoln Hospital, where Plaintiff was taken into the emergency room.

40.     In the emergency room, with police officers observing, Hospital staff examined Plaintiff, and at that time, Plaintiff received dialysis.

41.     After receiving dialysis, Plaintiff still felt ill.

42.     Plaintiff informed staff at the hospital that he had lost his sense of smell and taste, and after further testing, the hospital staff diagnosed Plaintiff with COVID-19.

43.     After Plaintiff received his treatment, Defendants transported Plaintiff back to the 41st precinct, where he was placed back in the holding room.

44.     Again, Defendants kept Plaintiff locked in the holding room of the 41st precinct overnight.

45.     On the morning of January 20, 2023, Defendants transported Plaintiff to One Police Plaza in handcuffs and shackles and placed Plaintiff in a cell.

46.     At or around 2:00 pm on January 20, 2023, Defendant finally arraigned Plaintiff during a virtual court session.

47.      Defendant charged Plaintiff at his arraignment with three counts of possession of liquid cocaine.

48.     Defendant Molina publicly announced the arrest of a correction officer pursuant to his new task force.  Molina claimed that this was part of his policy for cracking down on

7

correction officers smuggling drugs into Rikers Island.  The public announcement was lauded by New York City Councilmember Carlina Rivera, who had otherwise been vocally critical of Commissioner Molina's credibility, policies and effectiveness.   The New York Daily News reported that the joining of adversaries--Defendant Molina and Councilmember Rivera--in this "unprecedented" and "meaningful" action by Defendant Molina was a successful turnaround for Defendant Molina.   Plaintiff, however, was portrayed in the news report, with the help of Defendant Molina, as a nefarious drug smuggler who was weeded out by his heroic employer. The news report also included Plaintiff's name, age, salary, and charges (including the erroneous charge of promotion of prison contraband).

49.     After Plaintiff's arraignment, Plaintiff was released on his own recognizance, over 55 hours after Defendants first falsely imprisoned Plaintiff.

50.     After Plaintiff's arrest, Defendants removed Plaintiff from his position and suspended him from duty.

51.     Once the Bronx District Attorney processed the case, reviewed the evidence, and the alleged substance was tested properly, it was immediately clear there was no evidence of illegal drugs—the blue children's balloon was found not to have contained a controlled substance.

52.     Any trained officer would have known that drug contraband is not carried in children's blue balloons like the one found under Plaintiff's floor mat.

53.     On February 24, 2023, Plaintiff returned to court one more time, where the Bronx District Attorney formally dismissed all charges against Plaintiff.  Plaintiff was fully exonerated.

54.     Although all the charges were dismissed, Defendants refused to allow Plaintiff to return to his previous position in the horticulture unit of the DOC, where he worked due to his kidney disease and his need to receive dialysis frequently.  This was an accommodation made to

Plaintiff because it was one of the only positions safe for him to work in, given his disability. However, Defendants did not acknowledge Plaintiff's innocence of the bogus drug charges brought against him and instead placed him on "modified" duty, a status given to officers who engaged in the worst possible wrongdoing and are facing the steepest of disciplinary action, i.e., discharge. Those placed on modified duty are frequently the subject of ridicule and rumor through the DOC and are typically considered by their peers to be criminals themselves.

55.   Because Plaintiff was placed on modified duty, Defendants refused to allow Plaintiff to return to the horticulture unit—denying Plaintiff's request for a reasonable accommodation. Defendants also failed to engage with Plaintiff in an interactive dialog to find a position to accommodate his disability.

56.   Even though the Bronx District Attorney's office fully and completely dismissed all charges against Plaintiff because of the sham evidence against him, Defendants, who publicly touted their arrest of Plaintiff, refused to acknowledge the bad police practices of Molina's and Hernandez's handpicked ID security team and Plaintiff's innocence. They refused to acknowledge that because it would otherwise be another embarrassing episode and incident for Commissioner Molina—as he used Plaintiff as a successful example of his new policy to crack down on correction officers smuggling drugs into the Rikers Island jails. Therefore, simply for political reasons and to avoid embarrassment, Defendants continued to hold the incident involving the children's blue balloon against Plaintiff, kept him on modified duty, and refused to allow him to return to the position in the horticulture unit, i.e., they denied Plaintiff a reasonable accommodation and cast him as a criminal both amongst his peers and the press.

57.   Because Defendant refused to allow Plaintiff to return to the horticulture position as a reasonable accommodation or otherwise accommodate him by placing him and his dialysis

schedule in a similar position of which his doctor would approve, Plaintiff was constructively discharged and had no choice but to retire.

58.     Defendants Molina and Hernandez oversaw DOC ID's investigative team who searched Plaintiff's vehicle, detained Plaintiff, seized his vehicle, and believed that the blue children's balloon contained liquid cocaine.   Defendants Molina and Hernandez selected the investigators on the ID team, provided the orders and directed them to search officers as they arrived at work and to arrest Plaintiff based on illegitimate evidence—resulting in Keystone Cop buffoonery.

59.     Defendants Molina and Hernandez created the illegal policy of having DOC employees searched by an investigative team established by them and outside of the New York City DOI and in direct defiance of DOI's position to not arrest Plaintiff, and the officers in Molina's and Hernandez's squad acted upon Molina's and Hernandez's directives and plan.

60.     The reckless acts of the officers in searching, arresting, holding and charging Plaintiff for having a blue children's balloon was the result of Defendant Molina's illegal policy and practice.

61.     The callous acts of placing Plaintiff on modified duty, even though Plaintiff was fully exonerated, and refusing to allow him to return to his previous position in the horticulture unit, was part of Defendant Molina's policy and practice, as he refused to acknowledge Plaintiff's innocence and maliciously punished him simply to save face.

62.     As a result of Defendant's actions, Plaintiff suffered severe emotional distress and was constructively discharged.


**AS AND FOR THE FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 – Violations of the Fourth Amendment Unreasonable Search, Seizure, Arrest and Criminal Charge)**

63.     Plaintiff repeats, realleges, and incorporates all factual allegations previously set in this complaint as if fully set forth below.

64.     Under the Fourth Amendment, a person has the right to be free from an unreasonable seizure of their person and an unreasonable criminal charge.

65.     Defendants deprived Plaintiff of his rights under the Fourth Amendment to remain free from unreasonable seizure of his person and from an unreasonable criminal charge when they intentionally and recklessly arrested Plaintiff on the morning of January 18, 2023, and unreasonably charged him with a crime.

66.     On or around January 18, 2023, at approximately 6:00 am, DOC employees who were not part of New York City's Department of Investigation took Plaintiff into custody.  The DOC employees were part of an investigative team with DOC's ID formed by Defendants Molina and Hernandez to bypass the role of the DOI.

67.     In seizing Plaintiff's person without the supervision of the Department of Investigations, in defiance of DOI's position that an arrest was not warranted and without reasonable evidence, Defendants acted intentionally and recklessly.

68.     Due to the intentional and reckless actions of Defendants, Defendants misidentified a blue children's balloon as a container for drugs, and the little bit of liquid in the blue children's balloon found under the floor mat in the back seat of Plaintiff's car as liquid cocaine.

69.     Any reasonable officer would have known that a children's balloon, like the one found under the floor mat of Plaintiff's car, is not used for carrying drugs.

70.     Any reasonable officer would have known that the little bit of liquid found in the blue children's balloon could not have been liquid cocaine.

71.     No reasonable officer would have arrested and charged Plaintiff based on the above-mentioned evidence.

72.     But for Defendants recklessly searching and seizing of Plaintiff without the supervision of, and in defiance of, the DOI, and recklessly holding, arresting and charging Plaintiff based on the evidence of Plaintiff having a blue children's balloon under the floor mat of his car, Plaintiff would not have been subjected to the 55 hours of false imprisonment, would not have been charged with a felony drug crime and would not have lost his position at the DOC in the horticulture unit.

73.     Seizing Plaintiff without the permission of the DOI was unreasonable, and seizing, arresting and charging Plaintiff based on the balloon evidence was unreasonable.

74.     Defendants' continued punishment of Plaintiff, even after Plaintiff was fully exonerated, by placing him on modified duty and refusing to allow him to return to his previous position, only further violates Plaintiff's due process rights and demonstrates the damages and effect of Defendants' violation of his rights.

75.     Defendants have refused to acknowledge Plaintiff's innocence and exoneration, as they scapegoated Plaintiff to satisfy their political objectives, and when Plaintiff was exonerated, they continued to use the balloon incident against him to avoid additional embarrassment from the illegal arrest and charge.

76.     Plaintiff suffered extreme emotional distress, embarrassment, humiliation, harassment, and monetary damages as a result of the unauthorized seizure, arrest and criminal charge, including suspension from his job, the refusal by Defendants to place Plaintiff back in his previous position in the horticulture division, and public humiliation of being branded a corrupt officer in the New York Daily News article, resulting in a constructive discharge.

77.     Defendant's acts were a proximate cause of the injuries, monetary damages and distress sustained by Plaintiff.

78.     The actions by Defendants were part of Defendants' DOC policy and not the acts of rogue officers.  The non-DOI officers involved in the illegal search, seizure, arrest and charge of Plaintiff were following a policy set forth by the DOC, Molina, and Hernandez.

79.     Defendants' actions were so outrageously arbitrary and reckless as to be a gross abuse of governmental authority and a violation of the United States Constitution.

80.     Due to the egregious nature of Defendants' actions, Plaintiff is entitled to an award of compensatory, monetary, and punitive damages, including punitive damages against Defendants Molina and Hernandez in their individual capacity.

### AS AND FOR THE SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Violations of the 5th and 14th Amendments)
### Procedural Due Process

81.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

82.     New York State Criminal Procedure Law § 140.20(1) provides upon arresting a person without a warrant, a police officer, after performing without unnecessary delay all recording, fingerprinting and other preliminary police duties required in the particular case, must except as otherwise provided in this section, without undue delay bring the arrested person or cause him to be brought before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question.

83.     In People ex rel.  Maxian v. Brown, the Court of Appeals held that the steps leading up to arraignment can generally be accomplished well within 24 hours after arrest.  *See People ex rel. Maxian v. Brown*, 77 N.Y.2d 422, 427 (1991).

84.    Defendants took Plaintiff into custody on the morning of January 18, 2023, at approximately 6:00 am.

85.    Defendants did not bring Plaintiff before a local criminal court and file therewith an appropriate accusatory instrument charging him with the offense or offenses in question until January 20, 2023, at approximately 2:30 pm.

86.    Defendants held Plaintiff in custody for fifty-six and a half hours from arrest before bringing him to a local criminal court.

87.    During the fifty-six and a half hours of detainment, Plaintiff was often handcuffed, shackled, cuffed to a bench in a holding cell for extended periods of time, placed in a holding cell overnight, and treated as a criminal during the process.

88.    Defendants prolonged Plaintiff's detainment beyond a time reasonably necessary to accomplish the tasks required to bring an arrestee to arraignment.

89.    Even after Plaintiff was exonerated from the unreasonable and bogus charges made by Defendants, Defendants placed Plaintiff on modified duty as a result of the above-mentioned incident and refused to allow him to return to his job in the horticulture division of the DOC without process.

90.    Plaintiff suffered extreme emotional distress, embarrassment, humiliation, and harassment as a result of being unreasonably detained for so long without process.

91.    Defendant's acts were a proximate cause of the injuries and distress sustained by Plaintiff.

92.    Defendant's actions were so outrageously arbitrary and reckless as to be a gross abuse of governmental authority and a violation of the United States Constitution.

14

93.     Due to the egregious nature of Defendant's actions, Plaintiff is entitled to an award of compensatory, monetary, and punitive damages, including against Defendants Molina and Hernandez in their individual capacities.

**AS AND FOR THE THIRD CAUSE OF ACTION**
**(Violations of the**
**New York State Human Rights Law, NY Exec. § 291(2))**

94.     Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

95.     The New York State Human Rights Law prohibits discrimination against employees who have disabilities and requires that employers provide reasonable accommodations to those employees with disabilities.

96.     Plaintiff is disabled within the meaning of the New York State Human Rights Law—he has kidney disease necessitating dialysis.

97.     Plaintiff had worked in the DOC's horticulture unit as an accommodation to his disability—a unit of which his physician approved.  Plaintiff was able to perform all of the job's essential functions with this accommodation without unreasonable risk to Plaintiff's health.

98.     After Defendants improperly arrested and charged Plaintiff for having the blue children's balloon under the floor mat of his car, Defendants suspended Plaintiff.

99.     After Plaintiff was fully exonerated and all of the charges were dismissed, Plaintiff sought to return to his position in the horticulture unit consistent with the previous accommodation afforded to him by Defendants.

100.    Defendants refused to accommodate Plaintiff and allow him to return to his position in the horticulture division.

101.    Defendants refused to engage in an interactive dialog with Plaintiff to otherwise accommodate him, i.e., to allow him to work in a position that his physician could confirm

would not provide an unreasonable risk to Plaintiff's health.

102.    Defendants' refusal to accommodate Plaintiff by allowing him to resume his position in the horticulture department was based on Defendants attempt to save face in light of Plaintiff's full exoneration for the drug arrest Defendants touted to defraud the oversight agencies, councilmembers, and other advocates attempting to hold Defendants accountable for dangerous conditions on Rikers Island and was wholly unreasonable.

103.    Defendants' acts of refusing to accommodate Plaintiff by blocking his return to the one position that was physically safe for him and preventing that return because of spite and political reasons to prevent further embarrassment of Defendants, Defendants violated the New York State Human Rights Law.  The violation resulted in Defendants constructively discharging Plaintiff from his position with the DOC because he could not safely resume a position with the DOC without the aforementioned accommodation or other accommodation.

104.    As a result of Defendant's disability discrimination against Plaintiff and refusal to accommodate Plaintiff for his disability, Plaintiff lost his job and career with the DOC and all of the compensation, salaries, and benefits that came along with it, including health insurance.

105.    As a result of Defendants' disability discrimination and failure to accommodate Plaintiff, Plaintiff suffered from extreme emotional distress, humiliation and embarrassment.

106.    Defendant's acts were a proximate cause of the injuries, monetary losses and distress sustained by Plaintiff.

107.    Defendant's actions were so outrageously arbitrary and reckless as to be a gross abuse of governmental authority and a violation of the New York State Human Rights Law.

108.    Due to the egregious nature of Defendant's actions, Plaintiff is entitled to an award of compensatory, monetary, and punitive damages, including punitive damages as against Molina and Hernandez in their individual capacities.

16

## AS AND FOR THE FOURTH CAUSE OF ACTION
### (Violations of the
### New York City Human Rights Law § 8-107)

109.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

110.    The New York City Human Rights Law prohibits discrimination based on an employee's disability and requires employers to provide reasonable accommodations to those employees with disabilities.

111.    Plaintiff is disabled within the meaning of the New York City Human Rights Law—he has kidney disease necessitating dialysis.

112.    Plaintiff had worked in the DOC's horticulture unit as an accommodation to his disability—a unit of which his physician approved.  Plaintiff was able to perform all of the essential functions of the job with this accommodation without unreasonable risk to Plaintiff's health.

113.    After Defendants improperly arrested and charged Plaintiff for having the blue children's balloon under the floor mat of his car, Defendants suspended Plaintiff.

114.    After Plaintiff was fully exonerated and all the charges were dismissed, Plaintiff sought to return to his position in the horticulture unit consistent with the previous accommodation afforded to him by Defendants.

115.    Defendants refused to accommodate Plaintiff and allow him to return to his position in the horticulture division.

116.    Defendants refused to engage in an interactive dialog with Plaintiff to otherwise accommodate him, i.e., to allow him to work in a position that his physician could confirm would not provide an unreasonable risk to Plaintiff's health.

117.    Defendants' refusal to accommodate Plaintiff by allowing him to resume his

position in the horticulture department was based on Defendants' attempt to save face in light of Plaintiff's full exoneration for the drug crime and was wholly unreasonable.

118.    Defendants' acts of refusing to accommodate Plaintiff by blocking his return to the one position that was physically safe for him and preventing that return because of spite and political reasons to prevent further embarrassment of Defendants, Defendants violated the New York State Human Rights Law. The violation resulted in Defendants constructively discharging Plaintiff from his position with the DOC because he could not safely resume a position with the DOC without the aforementioned accommodation or other accommodation.

119.    As a result of Defendants' disability discrimination against Plaintiff and refusal to accommodate Plaintiff for his disability, Plaintiff lost his job and career with the DOC, and all of the compensation, salaries and benefits that came along with it, including health insurance.

120.    As a result of Defendants' disability discrimination and failure to accommodate Plaintiff, Plaintiff suffered from extreme emotional distress, humiliation and embarrassment.

121.    Defendant's acts were a proximate cause of the injuries, monetary losses and distress sustained by Plaintiff.

122.    Defendants' actions were so outrageously arbitrary and reckless as to be a gross abuse of governmental authority and a violation of the New York City Human Rights Law.

123.    Due to the egregious nature of Defendants' actions, Plaintiff is entitled to an award of compensatory, monetary, and punitive damages, including punitive damages as against Molina and Hernandez in their individual capacities.


## AS AND FOR THE FIFTH CAUSE OF ACTION
### (False Imprisonment)

124.    Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if set forth herein fully at length.

125.    Defendants intended to confine Plaintiff.

126.    Plaintiff was aware of his confinement.

127.    Plaintiff did not consent to the confinement.

128.    Plaintiff's confinement was not otherwise privileged.

129.    Defendants held Plaintiff falsely, for bogus reasons, for a total of fifty-six and a half hours before bringing him to a local criminal court.

130.    Defendant did not have probable cause or reasonable suspicion to believe Plaintiff committed a crime.

131.    Plaintiff suffered extreme emotional distress, embarrassment, humiliation, and harassment as a result of the unauthorized search, including the suspension from his job.

132.    Defendants' acts were a proximate cause of the injuries and distress sustained by Plaintiff.

133.    Defendants' actions were so outrageously arbitrary and reckless as to be a gross abuse of governmental authority and a violation of New York State Law.

134.    Due to the egregious nature of Defendants' actions, Plaintiff is entitled to an award of compensatory, monetary, and punitive damages.

**WHEREFORE,** Plaintiff respectfully requests a judgment against Defendants:

A.    Declaring that Defendants violated the United States Constitution by unreasonably searching, seizing, arresting and charging Plaintiff with a drug crime based on obviously bogus evidence, and doing so, outside of the proper mechanism set forth by the City for investigation, i.e., the DOI.

B.    Declaring that Defendants violated the New York State and New York City Human Rights Laws by refusing to accommodate Plaintiff, resulting in a constructive discharge.

C.    Declaring that Defendants violated common law by falsely imprisoning Plaintiff.

19

D.      Awarding Plaintiff damages for the above mentioned violations in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court that might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all monetary damages, including but not limited to, backpay, front pay, past and future income, wages, compensation, seniority, pension losses, health benefits and other benefits of employment.

E.      Awarding Plaintiff damages for the above mentioned violations in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and injuries. dignity, emotional pain and suffering and other physical and mental injuries;

F.      Awarding Plaintiff damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, but in any event in excess of the jurisdictional limit of any other court which might otherwise have jurisdiction over this matter, plus prejudgment interest;

G.      Awarding Plaintiff punitive damages, in an amount to be determined at trial, against Defendants Molina and Hernandez in their individual capacities;

H.      Awarding Plaintiff costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

I.      Awarding Plaintiff such other and further relief as the Court deems just and proper.


Dated: Garden City, New York
        January 17, 2024

                                        Stagg Wabnik Law Group LLP



                                        By: _____
                                             David Ehrlich
                                             Scott Clark
                                             *Attorneys for Plaintiff*
                                             *Darrell Wallace*
                                             401 Franklin Avenue, Suite 300
                                             Garden City, New York 11530
                                             (516) 812-4518
                                             *dehrlich@staggwabnik.com*

20