UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DARRELL WALLACE

*Plaintiff,*

– against –

THE CITY OF NEW YORK, LOUIS
MOLINA, Individually and as
Commissioner of the New York City
Department of Correction, and MANUEL
HERNANDEZ, Individually and as
Deputy Commissioner of the Investigation
Division of the New York City Department
of Correction,

*Defendants.*

---

**MEMORANDUM & ORDER**
24-cv-00380 (NCM) (LKE)

**NATASHA C. MERLE**, United States District Judge:

Plaintiff Darrell Wallace brings this action against The City of New York ("the City"), Commissioner Louis Molina ("Molina"), and Deputy Commissioner Manuel Hernandez ("Hernandez") (collectively "defendants"), for, among other things, alleged constitutional violations under 42 U.S.C. § 1983 that resulted in plaintiff's alleged false imprisonment and constructive discharge from his position as a correction officer at the Department of Correction ("DOC"). Am. Compl., ECF No. 19 ("AC"). Before the Court is defendants' Motion to Dismiss, ECF No. 31 ("the Motion").[1] For the reasons stated below, defendants' Motion is **GRANTED** in part and **DENIED** in part.

---

[1]     Throughout this opinion, page numbers for docket filings refer to the page numbers assigned in ECF filing headers.

**BACKGROUND**

The Court accepts as true for purposes of this Motion the well-pleaded factual allegations in plaintiff's amended complaint. In response to widespread criticism by oversight bodies and the City Council for the amount of drugs in DOC jails, Molina and Hernandez created the DOC's Investigation Division ("ID"), an internal "security squad" responsible for investigating the introduction of contraband into DOC jails. AC ¶ 1.

Plaintiff alleges that Molina and Hernandez established the ID for political purposes to demonstrate that they were serious about drug smuggling by correction officers. AC ¶ 22; Hr'g dated May 22, 2025 ("May 22 Tr.") 16:11–20 (draft on file with Court). The officers that Molina and Hernandez selected for the ID were not properly trained to perform searches of DOC employees for drugs or contraband. AC ¶ 75. Another reason that Molina and Hernandez established the ID was to bypass the Department of Investigation ("DOI")—the law enforcement agency for the government of New York City—and prevent the agency's involvement in the operation. AC ¶ 21. Plaintiff further alleges that the DOI is required to be involved in any administrative search or seizure of any New York City employee. AC ¶ 40.

## I.    Search of Plaintiff's Vehicle

Plaintiff alleges that on January 18, 2023, as he was entering Rikers Island at approximately 6:00 am for his 7:00 am shift, he was stopped by DOC employees conducting random searches of staff vehicles. AC ¶¶ 18–20. Two ID officers directed plaintiff to turn off his engine and lower his windows, and a correctional officer walked a K-9 dog around plaintiff's car. AC ¶¶ 24–26. The K-9 did not react. AC ¶ 26. Officers instructed plaintiff to get out of the car and took his shield and identification. AC ¶ 28. After plaintiff exited the car, officers placed the K-9 inside of the car, and the dog walked

back and forth between the front and back seats. AC ¶¶ 28–30. The K-9 again did not react. AC ¶ 30. The officers then informed plaintiff that his car would be searched in a separate area, and they drove the car out of plaintiff's sight. AC ¶ 31. After searching the car at the second location, officers found a blue untied children's balloon that contained a small amount of liquid under a mat. AC ¶¶ 32–33. The officers conducted a field drug test, and the substance in the balloon tested positive for liquid cocaine. AC ¶ 33. Plaintiff alleges that it was well known that the drug field tests defendants used were inaccurate, unreliable, and often resulted in false positives, AC ¶ 34, based on the November 4, 2021 Policy and Procedure Recommendation ("PPR") issued by the DOI that purportedly directed the DOC to discontinue field testing for contraband because of their unreliable results. AC ¶¶ 35, 92.

## II.    Plaintiff's Arrest

After the substance tested positive for cocaine, DOC officers took plaintiff into custody and contacted Hernandez to inform him of the situation. AC ¶ 38. Hernandez made the final decision to arrest plaintiff. AC ¶ 38. While still on Rikers Island, plaintiff informed DOC staff that he had a scheduled dialysis appointment on that day. However, he was told that he could not attend the appointment, despite requesting to go several times. AC ¶ 44. Later that day, plaintiff was transported by plainclothed DOC officers to the New York City Police Department's 41st Precinct in the back of a DOC vehicle. AC ¶ 45. DOC officers informed plaintiff that contraband was found in his car but plaintiff was not told what type of contraband. AC ¶¶ 45–46. Once at the 41st Precinct, New York City Police Department ("NYPD") officers fingerprinted plaintiff, read him his *Miranda* rights, and placed him in a holding cell. AC ¶ 47. NYPD officers eventually moved plaintiff from

the holding cell to a holding room then handcuffed him to a bench, where he remained overnight. AC ¶¶ 48–49.

The next morning, plaintiff was transported to central booking. AC ¶ 50. Upon arrival, he informed NYPD officers that he needed dialysis. AC ¶ 51. After 30 minutes, NYPD officers transported plaintiff to Lincoln Memorial Hospital emergency room to be examined and receive dialysis. AC ¶¶ 52–53. While still at the hospital, plaintiff was also tested for and diagnosed with COVID-19. AC ¶¶ 54–55.

After returning to the 41st Precinct, NYPD officers placed plaintiff in a holding room overnight. AC ¶¶ 56–57. On the morning of January 20, 2023, plaintiff was taken to One Police Plaza and placed in a cell. AC ¶ 58. At approximately 2:00 pm, plaintiff was arraigned and charged with three counts of possession of liquid cocaine. AC ¶¶ 59–60. Plaintiff was released on his own recognizance after over 55 hours in custody. AC ¶ 62.

### III.    Plaintiff's Discharge from DOC

Molina publicly announced the arrest of plaintiff by his new task force and said that the arrest was part of his policy of "cracking down" on correction officers smuggling drugs into Rikers Island. AC ¶ 61. The announcement was met with praise from New York City Councilmember Carlina Rivera, who had been critical of Molina's credibility, policies, and effectiveness. AC ¶ 61. The New York Daily News reported that the joining of adversaries, Molina and Councilmember Rivera, reflected a successful, "unprecedented," and "meaningful" turnaround for Molina. AC ¶ 61.

Plaintiff was removed from his position at the DOC and suspended from duty due to his arrest. AC ¶ 63; May 22 Tr. 33:07—35:02. The Bronx District Attorney reviewed the evidence and had the substance from the balloon tested in a lab. AC ¶ 64. The results concluded that the substance in the balloon was not cocaine. AC ¶ 64. On February 24,

2023, the Bronx District Attorney dismissed all charges against plaintiff. AC ¶ 68. After exoneration, defendants did not allow plaintiff to return to his previous position in the horticulture unit of the DOC, where he worked due to his kidney disease and frequent need for dialysis treatment. AC ¶ 69. Plaintiff was placed on modified duty, which plaintiff alleges is a status given to officers engaged in serious wrongdoing. AC ¶ 69. Because plaintiff was not allowed to return to the horiculture unit as an accommodation, he had no choice but to retire. AC ¶ 72.

## LEGAL STANDARD

When deciding a motion to dismiss, a district court must "accept all factual claims in the complaint as true, and draw all reasonable inferences in the plaintiff's favor." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 403 (2d Cir. 2014).[2] Factual disputes are typically not the subject of the Court's analysis as Rule 12 motions "probe the legal, not the factual, sufficiency of a complaint." *Plastic Surgery Group, P.C. v. United Healthcare Ins. Co. of New York, Inc.*, 64 F.Supp.3d 459, 468 (E.D.N.Y. 2014). That is, "the issue" on a motion to dismiss "is not whether a plaintiff will ultimately prevail" but instead whether a plaintiff is "entitled to offer evidence to support the claims." *Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012).

In order to survive a motion to dismiss pursuant to Rule 12(b)(6), a plaintiff must state "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v.*

---

[2]    Throughout this opinion, the Court omits all internal quotation marks, footnotes, and citations, and adopts all alterations, unless otherwise indicated.

*Bd. of Educ. of City Sch. Dist. of N.Y.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678). Although the Court takes all factual allegations contained in the complaint as true, it does not do so for legal conclusions or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" in a complaint. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I.     *Monell* – Municipal Liability against the City

Section 1983 authorizes private parties to enforce their federal constitutional rights against individuals acting under color of state law. 42 U.S.C. § 1983. In order to maintain a Section 1983 claim against a municipality, a plaintiff must allege three elements: "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 97 (2d Cir. 2020); *see also Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 691 (1978). Municipalities may not be held liable under Section 1983 pursuant to a respondeat superior theory of vicarious liability, thus "a plaintiff cannot merely establish that the municipality employed a tortfeasor; the plaintiff must establish that the municipality's own acts or inaction caused its employees to violate plaintiff's constitutional rights." *Boyd v. City of Buffalo*, No. 22-cv-00519, 2025 WL 262152, at *5 (W.D.N.Y. Jan. 22, 2025). Therefore, *Monell* is not a separate cause of action from Section 1983, rather it extends liability to a municipality where the municipality's own policies, practices, or customs led to a constitutional violation. *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006).

Defendants argue that plaintiff has failed to plausibly allege municipal liability against the City through the actions of defendants Hernandez and  Molina because

plaintiff has not alleged a municipal policy or custom, or defendants' personal involvement in any alleged constitutional violation suffered by plaintiff. The Court addresses each argument in turn.

   A.  *Existence of Policy, Practice, or Custom*

A plaintiff may establish the existence of a policy, practice, or custom by alleging one of the following *Monell* theories: "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Homere v. Inc. Vill. of Hempstead*, 322 F. Supp. 3d 353, 369 (E.D.N.Y. 2018).

Defendants argue that plaintiff has not established a policy, practice, or custom based on the failure to train, supervise, or discipline theory. Mot. 20. Specifically, defendants contend that they were not deliberately indifferent to the rights of citizens by using the field tests as the DOC was not aware that the tests were unreliable. Mot. 23. Thus, defendants argue that they were not on notice of a need for additional training or supervision. Mot. 21–22. However, it is sufficient for plaintiff to plausibly allege *one* of the four *Monell* theories. *Homere*, 322 F. Supp. 3d at 369.

The amended complaint alleges that in their roles as final decision-makers for the DOC, defendants Molina and Hernandez created an ID team responsible for investigating the introduction of contraband into DOC jails. AC ¶¶ 10–22. And though these officers

were not properly trained to perform such searches for drugs and contraband, the ID team was created to prevent DOI's involvement in the administrative search of DOC employees. AC ¶ 40. Plaintiff plausibly alleges that the use of the ID team, rather than the DOI, which is usually tasked with conducting such searches, led to his unlawful search, seizure and eventual arrest. AC ¶ 40. Defendants do not contest plaintiff's allegation that defendants created this policy that allegedly resulted in deprivation of plaintiff's constitutional rights. Accordingly, plaintiff has plausibly alleged actions taken by DOC government officials to establish a *Monell* claim against the City.

### B.  *Personal Involvement of Molina and Hernandez*

Defendants also argue that plaintiff has not alleged Molina and Hernandez's personal involvement in his arrest or detention. Mot. 14. To establish a defendant's individual liability in a suit brought under Section 1983, a plaintiff must show the defendant's "personal involvement" in the alleged constitutional deprivation. *Thomas v. Town of Lloyd*, 711 F. Supp. 3d 122, 132 (N.D.N.Y. 2024). Personal involvement may be established in one of four ways: "(1) direct participation; (2) learning of the deprivation but failing to remedy the wrong; (3) creating a policy or custom under which the deprivation occurred, or allowing such a policy or custom to continue; or (4) gross negligence in managing subordinates who caused the deprivation." *Aguirre v. Kendra*, 123 F. Supp. 3d 419, 423 (W.D.N.Y. 2015). Plaintiff must also show that the municipal policy or custom proximately caused the alleged violation of his constitutional rights. *Cash v. Cnty. of Erie*, 654 F.3d 324, 341–42 (2d Cir. 2011) (finding that proximate cause fairly describes a plaintiff's causation burden with respect to a municipal liability claim under Section 1983).

i. Fourth Amendment Violations

Plaintiff has sufficiently alleged Molina and Hernandez's personal involvement in the Fourth Amendment violation through their creation of the ID to conduct searches of DOC staff and their creation of the DOC's policy to continue using purportedly unreliable field tests. AC ¶¶ 21, 37, 85, 89. Further, the amended complaint alleges that Hernandez was contacted by ID officers and personally approved plaintiff's arrest. AC ¶ 38. Though defendants seem to argue that it is implausible that Hernandez approved plaintiff's arrest because he was out of the country, Mot. 14, plaintiff has provided sufficient allegations at this stage that, if taken as true, establish Hernandez's direct participation in plaintiff's arrest. Accordingly, plaintiff has sufficiently alleged both Molina and Hernandez's personal involvement in his Fourth Amendment constitutional violations.

ii. Fifth and Fourteenth Amendment Violations

Plaintiff alleges that defendants violated his Fifth and Fourteenth Amendment rights to procedural due process because he was held for more than 55 hours before being arraigned and because his dialysis treatment was delayed for more than a full day. Opp'n 26. Specifically, plaintiff argues that defendants failed to train subordinates to "properly and speedily process someone and give them medical attention when needed." May 22 Tr. 26:12—27:16. This argument is unavailing for two reasons.

First, these allegations are not contained in plaintiff's amended complaint, which only describes the events giving rise to violations of plaintiff's due process rights and does not allege that specific DOC policies caused the delay of plaintiff's arraignment and medical care. Factual allegations that are contained only in a plaintiff's opposition to a defendant's motion to dismiss or made at oral argument generally cannot be considered by the Court when considering the legal sufficiency of a plaintiff's complaint. *Harris v.*

*Wu-Tang Productions, Inc.*, 2006 WL 1677127, at *3 (S.D.N.Y. 2006) ("This Court need not consider an argument raised for the first time at oral argument.").

Second, even if the Court were to consider plaintiff's allegations made at oral argument, he does not allege that the delay of his arraignment or medical care was proximately caused by the actions of DOC personnel under the direct supervision of Molina or Hernandez. Plaintiff was initially detained by DOC personnel at Rikers Island but was later transported to the New York Police Department's 41st Precinct where officers read him his *Miranda* rights and later transported him to Lincoln Memorial Hospital for dialysis treatment. AC ¶¶ 50–53. Plaintiff was arraigned at the 41st Precinct where NYPD officers facilitated his arraignment after 55 hours in custody. AC ¶ 59. It was also NYPD officers who plaintiff allegedly apprised of his need for dialysis treatment and who eventually escorted him to the hospital for such treatment. AC ¶¶ 51–54.

The conduct that plaintiff asserts gives rise to the violation of his procedural due process rights was that of NYPD officers, not the DOC, defendants Hernandez and Molina, or the result of their policies.[3] Accordingly, plaintiff has failed to sufficiently allege Molina and Hernandez's personal involvement in his Fifth and Fourteenth Amendment procedural due process violations.

---

[3] In the amended complaint, plaintiff specifies that he was taken into custody and transported to the 41st Precinct by "DOC personnel." *See* AC ¶¶ 43–46. But in alleging due process violations related to the delay of his arraignment and medical care, plaintiff uses the general term "defendants." *See* AC ¶¶ 50–60. In doing so, plaintiff seems to conflate the DOC and NYPD. The Court declines to follow such imprecise allegations in assessing whether defendants' personal involvement has been plausibly alleged. The personal involvement requirement under *Monell* necessitates that, in this instance, in order for the City to be liable for the actions of the DOC, Molina and Hernandez, in their roles as municipal policymakers, must have themselves caused or participated in the alleged constitutional violations. *See Thomas*, 711 F. Supp. 3d at 132.

## II.    Fourth Amendment Claim Against Defendants

Even though plaintiff has plausibly alleged defendants' involvement in the conduct underlying the Fourth Amendment claim, plaintiff must also allege an underlying constitutional violation in order to sustain a *Monell* claim against the City. Plaintiff brings a claim against defendants for violation of his Fourth Amendment right to be free from unreasonable search and seizure. Defendants argue that plaintiff's Fourth Amendment claim fails because it was reasonable for plaintiff's vehicle to be subject to a random search given his diminished expectation of privacy as a correction officer. Mot. 25–26.

The Fourth Amendment requires that searches and seizures of persons be reasonable. U.S. Const. amend. IV. A search or seizure is typically unreasonable when there is no warrant or individualized suspicion of wrongdoing. *Dickerson v. Napolitano*, 604 F.3d 732, 750 (2d Cir. 2010). However, there are certain "limited circumstances in which the usual rule does not apply, and a warrantless, suspicionless search or seizure may be justified when special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *McLennon v. City of New York*, 171 F. Supp. 3d 69, 84 (E.D.N.Y. 2016).

Plaintiff contends that defendants violated his Fourth Amendment rights by conducting the search of his car without specific probable cause to field test an untied children's balloon for narcotics because there was no "fair probability" of finding "narcotics stored in an item of trash on the floor of a car[.]" Opp'n 25–26. Plaintiff cites *Cerrone v. Brown*, 246 F.3d 194 (2d Cir. 2001), in support of his argument that probable cause, rather than reasonable suspicion, is the appropriate standard in this case. Opp'n 25. Plaintiff's reliance on *Cerrone* is inapposite.

In *Cerrone*, there was individualized suspicion of a police officer's misconduct for his role in a cover-up of a hit-and-run accident. 246 F.3d at 196. The question here is not whether there was probable cause for the warrantless search, but whether there was a "special need" as to make the warrant and probable-cause requirement impracticable. Plaintiff alleges, and defendants do not dispute, that he was searched and seized without a warrant or individualized suspicion, as the searches of DOC staff were conducted at random. AC ¶ 20; Mot. 25; Opp'n 25–26; Therefore, the ID's search was suspicionless. *See Nicholas v. Goord*, 430 F.3d 652, 662 (2d Cir. 2005) (applying the special needs test and finding that a privacy intrusion could pass constitutional muster without a finding of probable cause). When a suspicionless search is at issue, the special-needs exception is employed. *Id.* at 667. Despite this, both parties neglected to engage in an analysis of the "special needs" doctrine.[4]

### A. Applicability of the Special-Needs Doctrine

Plaintiff alleges, and defendants do not dispute, that he was searched and seized without a warrant or individualized suspicion. Therefore, the ID's search was suspicionless, and the Court next assesses whether "special needs" justified plaintiff's search and whether the character and manner of the search and seizure forecloses plaintiff's Fourth Amendment claim.

When considering a program of searches and applying the special-needs doctrine, in which the usual rule that a search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing does not apply, courts must conduct an inquiry into the purpose of the program. *McLennon*, 171 F. Supp. 3d at 84. Specifically, "a

---

[4]    At oral argument when discussing whether the special-needs doctrine applies to this case, neither party argued it was inapplicable. *See* May 22 Tr. 9:05–11:14.

program or general scheme of searches . . . qualifies for treatment under the special-needs doctrine" only if the primary programmatic purpose of the searches is not the government's general interest in crime control. *Id.* When such special needs—concerns other than crime detection or ordinary gathering of evidence in connection with an investigation—are alleged to justify a Fourth Amendment intrusion, courts "undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Chandler v. Miller*, 520 U.S. 305, 314 (1997). *See also Goord*, 430 F.3d at 667. It is the program's immediate objective that is relevant, not its ultimate goal. *Id.* at 667–68. "[T]he mere fact that crime control is *one* purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine." *Lynch v. City of New York*, 589 F.3d 94, 102 (2d Cir. 2009).

To determine whether the special needs of the government permit a search that would otherwise be impermissible under the Fourth Amendment, courts assess the program's reasonableness by applying a balancing test. *McLennon*, 171 F. Supp. 3d at 85 (citing *Dickerson*, 604 F.3d at 750). To pass constitutional muster, there must be a "further finding that the interests served by the special needs outweigh the privacy interests at stake." *Id.* In applying the test, courts consider "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest that is compromised by the search, (3) the character of the intrusion imposed by the search, and (4) the efficacy of the search in advancing the government interest." *Dickerson*, 604 F.3d at 750–51.

i. Primary Purpose of ID's Random Searches

The allegations in plaintiff's amended complaint give rise to a reasonable inference that the ID's search of DOC employees as they entered work had multiple purposes which

are unrelated to crime control.[5] Specifically, plaintiff alleges that Molina and Hernandez established the ID's search of DOC employees for "political purposes with the hope to find a scapegoat they could use to show that they are serious about the issue of drugs and contraband being smuggled into the DOC jails." AC ¶ 22; May 22 Tr. 16:11–20. Throughout the amended complaint, plaintiff concedes that the policy was established to demonstrate that the DOC was "cracking down" on drug smuggling by correction officers. AC ¶¶ 20, 61, 71. Therefore, the searches served as a deterrent designed to convey to employees that the smuggling of contraband is likely to be discovered, providing an extra incentive for DOC officers to follow DOC regulations. *See Lynch*, 589 F.3d at 101 (noting that purpose of search program designed to deter NYPD officers from violating NYPD policies was "not in crime control but in personnel management").

Plaintiff also alleges that the policy was in response to widely publicized criticism from oversight bodies and the City Council. AC ¶ 20. These facts support a reasonable inference that an additional purpose of the ID searches was to promote the DOC's reputation as a law enforcement agency among New York City residents and to maintain community relations, another purpose unrelated to crime control. *See Lynch*, 589 F.3d at 101 (upholding district court's finding that a search program's purpose of promoting law enforcement agency's reputation among residents and maintaining community relations warranted application of the special-needs doctrine). While the amended complaint asserts the ID's searches had multiple goals, the plaintiff does not allege that the

---

[5]    At oral argument, when asked about the primary purpose of the ID's random searches, defense counsel asserted that the purpose was to "ensure safety" and prevent the smuggling of contraband. *See* May 22 Tr. 9:18–10:21.

immediate goal was crime control. Therefore, the special-needs doctrine is applicable here.

### ii. Government's Interest

The Second Circuit has recognized the "legitimate penological imperatives of maintaining prison security and preserving internal order and discipline." *Sec. & L. Enf't Emps., Dist. Council 82, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Carey*, 737 F.2d 187, 203 (2d Cir. 1984). Plaintiff does not deny that detecting contraband at the DOC is a compelling interest, or that randomly searching employees may help discover such contraband, instead, plaintiff has an issue in the implementation of the program. Opp'n 25.

### iii. Plaintiff's Expectation of Privacy

The special needs exception is principally applied in the context of suspicionless searches where the plaintiff has a "diminished expectation of privacy." *See Goord*, 430 F.3d at 666–67. "The Fourth Amendment protects only those subjective expectations of privacy that society recognizes as legitimate." *Allen v. Schiff*, 908 F. Supp. 2d 451, 460 (S.D.N.Y. 2012), *aff'd*, 586 F. App'x 759 (2d Cir. 2014). Therefore, "a search considered inappropriate in one context may be reasonable in the context of public employment, especially given the operational realities of the workplace." *Id*. "Correction officers have diminished expectations of privacy in light of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff [] prisons." *Sec. & L. Enf't Emps.*, 737 F.2d at 202. "It is well established that the government has a compelling interest in ensuring the integrity of its law enforcement officers who interdict drugs[.]" *Allen*, 908 F. Supp. 2d at 463. Plaintiff's duties as a correction officer included interdicting

illegal drugs and maintaining prison security, therefore his legitimate expectation of privacy was substantially diminished by virtue of his duties. *Id*. at 460–61.

    iv. <u>Character and Manner of the DOC's Search</u>

Though the special-needs doctrine applies here and may permit a suspicionless search of plaintiff, that does not end the Court's inquiry at this stage. The Court must next assess whether the plaintiff has plausibly alleged that the character and manner of the search was improper and outweighs the special needs articulated by the government. *Lynch*, 589 F.3d at 100 ("[T]he court must then conduct a context-specific inquiry into the reasonableness of the program, weighing the special need against the privacy interest advanced."). The reasonableness of a search is a matter of law, but the character and manner of the search is a matter of fact. *Allen*, 908 F. Supp. 2d at 461. *See also Collier v. Locicero*, 820 F. Supp. 673, 679 (D. Conn. 1993) (noting that evidence indicating a search was excessively intrusive may be sufficient to raise questions of fact that preclude judgment as a matter of law).

The critical question is "whether [the government's] interest appears important enough to justify the particular search at hand, in light of other factors that show the search was highly intrusive upon a diminished expectation of privacy." *Allen*, 908 F. Supp. 2d at 463 (quoting *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 661 (1995)). Put another way—although correction officers may have a diminished expectation of privacy by virtue of their duties—the character, manner, and level of intrusiveness may still render a search unreasonable. *Allen*, 908 F. Supp. 2d at 461 (noting that the manner in which a program is carried out may be so unnecessarily intrusive as to render it constitutionally intolerable).

Defendants rely on a correction officer's diminished expectation of privacy to justify the reasonableness of the ID's search of plaintiff's car. Mot. 25. Plaintiff alleges that the search was conducted "outside of the proper mechanism set forth by the City for investigation," *see* AC ¶ 161, by an untrained group of individuals in lieu of the agency with the knowledge and authority to conduct such searches of New York City employees, the DOI. AC ¶¶ 22, 75, 161.

Plaintiff alleges that ID officers initially walked a K-9 around his car, and the dog did not react. AC ¶¶ 24–26. Despite the lack of reaction, the officers asked plaintiff to step out of the car and placed the K-9 inside of plaintiff's car. AC ¶¶ 28–30. The dog still did not react. AC ¶ 30. Despite a second instance of non-reaction from the K-9, ID officers took plaintiff's car to a second location—out of plaintiff's sight—to continue searching, and then the ID officers found the blue children's balloon under plaintiff's floor mat. AC ¶¶ 31–36. These allegations, taken together and assumed as true at the pleading stage, plausibly suggest that the continued search of plaintiff's car without further indication from the K-9 to do so, rendered the search unreasonably intrusive, and thus constitutionally intolerable under the Fourth Amendment.

\*        \*        \*

Thus, because the amended complaint alleges facts that support the unreasonableness of the character and manner of the intrusion, plaintiff has plausibly alleged that the special needs did not outweigh plaintiff's privacy interest. Accordingly, defendants' motion is denied as to plaintiff's Fourth Amendment claim.

### III.    False Imprisonment under New York Law against Defendants

Plaintiff also argues that the ID officers' reliance on untrustworthy information— an unreliable drug field test known to produce false positives—negates probable cause for

his arrest, and therefore he has adequately alleged a prima facie case for false imprisonment. May 22 Tr. 15:01–16:02. Defendants disagree and argue that plaintiff's false arrest claim fails "because his detention was privileged on the basis of probable cause *vis-à-vis*, the positive field test." Mot. 24.

Under New York law, an action for false imprisonment requires that the plaintiff show that "[1] the defendant intended to confine him, [2] the plaintiff was conscious of the confinement, [3] the plaintiff did not consent to the confinement, and [4] the confinement was not otherwise privileged." *Lumpkin v. Brehm*, 230 F. Supp. 3d 178, 183 (S.D.N.Y. 2017) (quoting *Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012)). Even if the first three prongs are satisfied, a false imprisonment claim will fail where a defendant establishes that probable cause existed for the arrest. That is, "the existence of probable cause constitutes justification and is a complete defense to an action for false . . . imprisonment." *Wong v. Yoo*, 649 F. Supp. 2d 34, 58 (E.D.N.Y. 2009). Defendant bears the burden of demonstrating that there was probable cause for plaintiff's arrest. *Yang Feng Zhao v. City of New York*, 656 F. Supp. 2d 375, 386 (S.D.N.Y. 2009).

Here, given defendants' reliance on a field test that indicated liquid cocaine was found in plaintiff's vehicle, plaintiff's false arrest claim rests on whether the alleged unreliability of the field test was well known. In other words, if plaintiff has not plausibly alleged that the officers should have known the field test was untrustworthy, the officers would be justified in relying on it to form probable cause for his arrest.

### A. Consideration of Defendants' Extraneous Exhibit 1

Plaintiff's argument that the field drug tests were unreliable rests primarily on the DOI's November 2021 Policy and Procedure Recommendations (PPR), which he alleges put the City on notice of the unreliable nature of the field tests. *See* AC ¶ 36. In rebuttal to

plaintiff's characterization of the PPR, defendants request that the Court consider defendant's Exhibit 1, the November 4, 2021 PPR, annexed to the Declaration of Mary Jane Anderson and submitted in support of the Motion. ECF No. 32-1. Specifically, defendants contend that plaintiff's allegation that the DOI issued a PPR which asked the DOC to stop field testing for contraband because of their unreliable results is contradicted by the text of the actual PPR. Mot. 13. Defendants further argue that since plaintiff referenced the PPR in his amended complaint, the Court may incorporate it by reference. Mot. at 13. Plaintiff responds that the Court should not consider defendant's exhibit because it is "outside of the four corners of the [a]mended [c]omplaint." Opp'n 17.

To begin, "[w]hen the plaintiff fails to introduce a pertinent document as part of [their] pleading, the defendant may be permitted to introduce the document as an exhibit to a motion attacking the sufficiency of the pleading if the plaintiff has referred to the item in the complaint and it is central to [their] affirmative case. *DiJoseph v. Erie County*, No. 18-cv-0919S, 2020 WL 2126976, at *5 (W.D.N.Y. May 5, 2020). Where a plaintiff relies on the terms and effect of a document in drafting the complaint, and that document is thus integral to the complaint, the Court may consider its contents on a motion to dismiss. *Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.,* 650 F. Supp. 3d 62, 72–73 (S.D.N.Y. 2023).

Plaintiff references the contents of the DOI's November 4, 2021 PPR three times in the amended complaint, AC ¶¶ 35, 65, 92, and yet, plaintiff did not attach the PPR document to the amended complaint. Moreover, plaintiff does not dispute the accuracy of defendants' Exhibit 1—the PPR referenced in plaintiff's complaint. May 22 Tr. 27:16–28:04. Accordingly, the Court considers defendants' Exhibit 1 to be incorporated by reference to plaintiff's amended complaint. And this document plainly contradicts

plaintiff's characterization of the PPR, which does not concern the reliability of field tests, but instead chain of custody issues. Indeed, the PPR states: "DOI recommends that [Correction Intelligence Bureau] consider foregoing field testing evidence to prevent having an additional layer in the chain of custody." ECF No. 32-1. Thus, as defendants correctly point out, "[n]owhere in the recommendation does the DOI state that the field tests are unreliable." Mot. 19. Therefore, the Court accepts as true that the DOI's suggestion to forego testing was due to chain of custody issues, and did not concern the reliability of field drug tests.

### B. *Probable Cause Analysis*

"Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991). Probable cause is an objective determination based upon the information available to the officer at the time of the arrest. *Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004). "[T]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 524 (S.D.N.Y. 2015).

Aside from the November 2021 PPR, which plaintiff incorrectly described in his complaint, plaintiff has no factual basis for his allegation that Molina and Hernandez, or the DOC, knew that the field drug tests were unreliable. May 22 Tr. 21:04–25:03. Instead, plaintiff asks the Court to make a number of inferences. Specifically, plaintiff asks the

Court to find that because he alleges that the DOI was aware of the tests' unreliability,[6] that knowledge is automatically imputed to the City, as well as to Molina and Hernandez as policy-makers of the DOC. May 22 Tr. 18:18–19:24; 30:4–13.

Plaintiff reasons that despite DOC and DOI being "different parts of the City," the knowledge of one law enforcement agency is imputed to all agencies within the City. *See* May 22 Tr. 29:02–31:06. Plaintiff's argument rests on an inference too far. Without a factual basis, plaintiff's allegations are conclusory and speculative. Moreover, plaintiff's statement that once he gets "through discovery," he will be able to demonstrate that the DOC and individual defendants were aware of the field tests' purported unreliability demonstrates that, at this time, he does not have factual support for that allegation. May 22 Tr. 24:04–24:15; May 22 Tr. 27:16–30:14.

Therefore, defendants' reliance on the field test's positive result was reasonable and established probable cause for plaintiff's arrest. Accordingly, plaintiff's false imprisonment claim is dismissed.

## IV.    Disability Discrimination under NYSHRL and NYCHRL Against Defendants

"Supplemental jurisdiction allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." *Rivera v. Ndola Pharmacy Corp.*, 497 F. Supp. 2d 381, 387 (E.D.N.Y. 2007) (quoting

---

[6]    Plaintiff's allegation that DOI was aware of the drug field tests' unreliability is also conclusory and asserted without any supporting facts. *See* AC ¶¶ 34–36. Indeed, when asked at oral argument for plaintiff's basis for the allegations as to DOI, plaintiff described a November 2024 DOI report that concluded the field tests were unreliable based on a study that the agency initiated in 2022. May 22 Tr. 16:11–22:24. None of these allegations are included in plaintiff's amended complaint.

*Wisconsin Dep't of Corr. v. Schacht*, 524 U.S. 381, 387 (1998)). When a district court evaluates whether certain claims are part of the same case or controversy as other claims for purposes of supplemental jurisdiction, the "common nucleus of operative fact" standard applies. *Hamilton Rsrv. Bank Ltd. v. Democratic Socialist Republic of Sri Lanka*, 134 F.4th 73, 79 (2d Cir. 2025). In determining whether two disputes arise from a common nucleus of operative fact, courts ask whether the facts underlying the federal and state claims substantially overlap or whether the federal claim necessarily brought the facts underlying the state claim before the court. *Id.* at 80.

To establish a prima facie case for employment discrimination under the NYSHRL and NYCHRL, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to the inference of discrimination. *Palmer v. Cook*, 108 N.Y.S.3d 297, 306 (N.Y. Sup. Ct. 2019). Under the NYCHRL, plaintiff must demonstrate that they were treated less well than any other employee *because of* a protected characteristic. *See* N.Y.C. Admin. Code § 8-107(1)(a).

Here, plaintiff alleges that he was constructively discharged by the removal of his disability accommodation because of his false arrest and the stigma that followed. May 22 Tr. at 31:17–34:18. However, the facts supporting plaintiff's federal claims of false imprisonment and for violations of his constitutional rights do not substantially overlap with the prima facie elements for employment discrimination under the NYSHRL or NYCHRL. Specifically, whether plaintiff was subjected to unreasonable search and seizure or denied procedural due process are not relevant to the query of whether he is a member of a protected class, qualified for his job position, or suffered an adverse employment action because of discrimination. Even accepting as true plaintiff's allegation

22

that he was discharged and later denied renewal of his accommodation due to his false arrest and the stigma that followed, that does not establish plaintiff's state and city disability claims. Accordingly, the Court declines to exercise supplemental jurisdiction over plaintiff's New York state and city law claims.

## CONCLUSION

For the reasons stated above, defendants' Motion is **GRANTED in part, DENIED in part.** Plaintiff's Fifth and Fourteenth Amendment due process, false imprisonment, and New York state and city Human Rights Law claims against defendants are hereby dismissed. Defendants' Motion is denied as to plaintiff's Fourth Amendment unreasonable search claim. This case is referred to Magistrate Judge Lara K. Eshkenazi for pretrial supervision.


**SO ORDERED.**

_____*/s/ Natasha Merle*_____
NATASHA C. MERLE
United States District Judge


Dated:        June 2, 2025
              Brooklyn, New York